UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x

ARNOLD HERSKO, as Administrator of
the Estate of Rochel Hersko, and      :
ARNOLD HERSKO, individually,

                                      :

            Plaintiffs,               MEMORANDUM & ORDER

                                      :

            -against-                 13 CV. 3255 (MHD)

                                      :

UNITED STATES OF AMERICA, THOMAS D.
KERENYI, M.D., JOHNATHAN SCHER, M.D.,:
VICTOR M. GRAZI, M.D., NEW SQUARE
OB/GYN ASSOCIATES, LLP, ANDREW        :
KRAMER, M.D., and JOHNATHAN
LANZKOWSKY, M.D.,                     :

            Defendants.               :
------------------------------------x

MICHAEL H. DOLINGER
UNITED STATES MAGISTRATE:

      Plaintiff Arnold Hersko, the husband of the late Rochel

Hersko, has filed suit against the United States under the Federal

Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 et seq., and against a

host of doctors and a medical clinic (collectively "the private

defendants") under the common law, asserting claims for medical

malpractice that allegedly caused or contributed to the untimely

death of his wife in childbirth in 2007. He asserts these claims as

executor of Mrs. Hersko's estate and on his own behalf.

      With the completion of discovery, the United States and the

1

private defendants have moved separately for summary judgment. Plaintiffs oppose. We grant the motions in part and deny them in part.

## I. The Basic Undisputed Facts

The events that immediately led to the death of Mrs. Hersko occurred during the birth of the Herskos' fourth child. An assessment of the plaintiff's claims, however, requires a review of Mrs. Hersko's fairly involved medical history.

Mrs. Hersko was born in 1975. During childhood she was diagnosed with Noonan's Syndrome. (Pl. 56.1 St. ¶ 10; US 56.1 St. ¶ 11; Kirschner Dep. 47). That condition affects various internal organs, including the heart, and causes a significant percentage of affected patients to suffer from coagulopathies. (Id. ¶ 11; Pl. 56.1 St. ¶ 10).[1]

---

[1] We note that the private defendants state in their 56.1 statement that the frequency of coagulopathy is about 20 percent, but decreases with age. (Pr. Defts 56.1 St. ¶ 12)(citing Berman Decl. Ex. T at 22)). In contrast, plaintiff's obstetrical expert, Dr. Gideon Panter, estimates that the frequency of coagulopathy in Noonan's Syndrome patients is closer to 50 percent.(Seskin Decl. Ex. O at 4).

2

While still a young child, Mrs. Hersko underwent a procedure to address pulmonic stenosis, a defect in the heart valve that is associated with Noonan's Syndrome. (Pl. R. 56.1 St. ¶ 11[2]; U.S. 56.1 St. ¶ 12; Kirschner Dep. 25-27, 49; Krause Decl. Ex. E at 00199, 00371, 00374). At some point Mrs. Hersko came under the care of a cardiologist, Dr. Jose Meller. Following her marriage to Mr. Hersko, she went through four pregnancies. Dr. Meller evaluated her cardiac status for each of these pregnancies. (Pl. R. 56.1 St. ¶ 12; Pr. Defts. 56.1 St. ¶ 16; Berman Decl. Ex. J at 00195-230).

Mrs. Hersko was a patient at the Refuah Health Center, a federally supported institution in Spring Valley, New York. (U.S. 56.1 St. ¶ 1; Pl. 56.1 St. ¶ 1). Through Refuah, she received primary, gynecological and obstetrical care. (Id. ¶ 13). The obstetric care was provided by a series of doctors -- including Drs. Andrew Kramer and Johnathan Lanzkowsky, both defendants here -- who were associated with another entity, defendant New Square Ob/Gyn Associates, which served as an independent contractor for Refuah. (U.S. 56.1 St. ¶¶ 8-9; Kramer Dep. 9-10, 131-33; Lanzkowski Dep. 8-9, 14-15, 17, 99).

---

[2] We note that a number of the assertions made in plaintiff's 56.1 statement are not accompanied by citations to the record.

3

Mrs. Hersko's first pregnancy occurred in 1996-97, at which time she received pre-natal care at Refuah. (Pl. 56.1 St. ¶ 13). On June 9, 1997, she was seen by defendant Dr. Victor M. Grazi, also of New Square, for a regularly scheduled pre-natal check-up. By that time she was 36 weeks pregnant, and was found to be 7 centimeters dilated and 100% effaced, even though she was unaware that she was having contractions. She was promptly sent to Mt. Sinai Hospital in Manhattan, where she was treated by defendant Dr. Kramer. She delivered the same day, with no complaints relating to her labor. (Id. ¶ 14; U.S. 56.1 St. ¶¶ 14-15; Pr. Defts. 56.1 St. ¶ 18; Kramer Dep. 120-22; Krause Decl. Ex. E at 00293, 00319-25, 00414-15; Berman Decl. Ex. J at 00046-47, 00101-04).

Mrs. Hersko's second pregnancy led to delivery on January 13, 2000, at 40 weeks. That pregnancy and delivery were uneventful. (Pl. 56.1 St. ¶ 15; U.S. 56.1 St. ¶¶ 16-17; Pr. Defts. 56.1 St. ¶ 19; Seskin Dep. Ex. BB; Krause Decl. Ex. E at 00248-54; Berman Decl. Ex. J at 00043-44, 00238-43).

Mrs. Hersko became pregnant a third time in 2003. Her first pre-natal visit was on September 24, 2003. Her due date was April 29, 2004. (Pl. 56.1 St. ¶ 16; Pr. Defts. 56.1 St. ¶ 20; Berman Decl. Ex. J at 00035-38). During that pregnancy, blood work showed

4

a hemoglobin count of 12.9, which was within a normal range. Her last pre-natal visit was on April 22, 2004, at 39 weeks. At the time she was 1 centimeter dilated and 50 percent effaced, with no complaints. The doctor scheduled her for a follow-up visit on April 29, 2004. (Pl. 56.1 St. ¶ 16: Pr. Defts. 56.1 St. ¶ 22).

On April 23, at about 3:20 a.m. Mrs. Hersko delivered her baby at home, while sitting on the toilet. Her husband was also at home, and immediately called for an ambulance. (Hersko Dep. 79-84; Lanzkowski Dep. 18). The call was apparently made at 3:22 a.m., and the ambulance arrived at 3:26 a.m.. The ambulance record recited that Mrs. Hersko was bleeding and lying in a "huge pool of blood". (Pl. 56.1 ¶ 17; Seskin Decl. Ex. F). She was responsive only to voices, and there was initial difficulty measuring any blood pressure. The emergency personnel administered fluids, oxygen and Pitocin,[3] and she subsequently recovered alertness and her blood pressure returned to normal. (Pl. 56.1 St. ¶ 17; U.S. 56.1 St. ¶¶ 18-20; Pr. Defts. 56.1 St. ¶¶ 22-23; Krause Decl. Ex. E at 00397-00401, 00138 00143-44, 00164).

---

[3] Pitocin is a uterine stimulant. It is used, inter alia, to induce labor in certain women and to control post-birth bleeding. "Drugs.com" at https:/www.drugs.com/cdi/pitocin.html.

5

The ambulance transported Mrs. Hersko to Nyack Hospital, where she arrived at 3:50 a.m. She was given more Pitocin, and her hemoglobin was measured at only 5.6. The hospital transfused her with two units of blood. (Pl. 56.1 St. ¶ 18; U.S. 56.1 St. ¶ 20; Pr. Defts. 56.1 St. ¶ 22; Berman Decl. Ex. J at 00164-65). According to the Government's expert hematologist, Dr. Louis M. Aledort, these figures reflect "a massive hemorrhage" and a loss of two-thirds of her blood volume. (Pl. 56.1 St. ¶ 19; Seskin Decl. Ex. G & H at 39, 41). The Government's family practice expert, Dr. James Mumford, quantified the loss as six units of blood, and he viewed her condition as potentially fatal absent immediate intervention. (Pl. 56.1 St. ¶ 20; Mumford Dep. 55). Similarly the United States maternal fetal expert, Dr. Mary D'Alton, and the private defendants' hematology expert, Dr. Tauseef Ahmad, characterized Mrs. Hersko's blood loss as life-threatening. (D'Alton Dep. 76-78; Ahmad Dep. 40).

On April 23, Dr. Kramer -- who was apparently involved in at least three of plaintiff's pregnancies -- received a phone call from someone at Nyack Hospital concerning Mrs. Hersko. At the time he penned a note stating "Received call from Nyack Hospital. Patient delivered at home. Patient never contacted me regarding labor. According to hospital staff, patient did not realize she was

6

in labor." (Pl. 56.1 St. ¶ 23; U.S. 56.1 St. ¶ 21; Seskin Decl. Ex. M). Dr. Kramer had no recollection at the time of his deposition as to the substance of the call or the identity of the person who had called him. (Pl. 56.1 St. ¶ 23; Kramer Dep. 110-11). He never called the hospital to obtain any further details or to determine Mrs. Hersko's condition (Pl. 56.1 St. ¶ 24; Kramer Dep. 116-17), even though he testified that if "an event that is out of the ordinary" occurs, we will often times touch base." (Pl. 56.1 St. ¶ 24; Kramer Dep. 117). He did not include in the note or other patient records any reference to the bleeding, insisting that he would have done so if his interlocutor had mentioned that fact (Kramer Dep. 27, 111-12), and the Refuah records contain no other information about that event or of any effort by medical staff at Refuah to obtain -- or ask Mrs. Hersko to obtain -- those records. (Pl. 56.1 St. ¶¶ 25-26; Kramer Dep. 21, 24, 118). Indeed, Dr. Kramer testified that he did not learn of the heavy bleeding on this occasion until after Mrs. Hersko's death following the fourth birth. (Pl. 56.1 St. ¶¶ 27, 39; Kramer Dep. 73). Similarly, Dr. Lanzkowski was ignorant of the details of the prior delivery until after Mrs. Hersko's death. (Lanzkowski Dep. 41-42).

Mrs. Hersko attended a post-partum appointment on June 9, 2004, when she was seen by defendant Dr. Lanzkowsky. (Pl. 56.1 St.

7

¶ 28). He had no recollection of this visit or of Mrs. Hersko as a patient. (Lanzkowski Dep. 27). His notes reflect that he was aware at the time of her extramural delivery at the third birth and her stay at Nyack. His notes do not refer to the bleeding that occurred at the time of the birth. (Pl. 56.1 St. ¶ 28; Seskin Decl. Ex. N; Lanzkowski Dep. 41-42)

At Dr. Lanzkowsky's deposition he stated that "typically" if an extramural delivery occurred, "we would have requested the records." (Lanzkowski Dep. 18). This is done "to review any medical treatment she received, to get a better idea of what transpired with her. To prepare us for future pregnancies." (Id. at 18-19). Despite that practice, there is no indication in the records of Refuah or in the testimony of any of the doctors that they did so in this instance. (Pl. 56.1 St. ¶ 30; Lanzkowski Dep. 23-24). Dr. Lanzkowski also testified that an event involving a hemorrhage or significant bleeding was supposed to be noted in the records, but the records of Refuah contain no such notation. (Id. at 46). Both obstetricians testified that they did not know of the prior hemorrhaging until after her death. (Kramer Dep. 73; Lanzkowski Dep. 41-42).

Following Mrs. Hersko's post-partum appointment with Dr.

8

Lanzkowsky, she was seen four times by her gynecologist, Dr. Kirschner-Lankowsky, between November 16, 2004 and October 23, 2006. (U.S. 56.1 St. ¶ 35). Dr. Kirschner had no memory of those visits, and professed no awareness that Mrs. Hersko's most recent delivery had been extra-mural. (Kirschner Dep. 22). Although she had the Refuah records accessible to her and stated that her practice was to review at least some of them in connection with patient visits, she reported that she had not seen Dr. Kramer's note from his phone call with a Nyack Hospital staff member. (Id. at 32). She also disclaimed any knowledge of Mrs. Hersko's history of being unaware of contractions and having speedy deliveries. (Id. at 38-39).

The notes of these visits reflect that on November 16, 2004 Dr. Kirschner took some sort of history of past pregnancies but no details were recorded. (U.S. 56.1 St. ¶ 37; Krause Decl. Ex. E at 00374). The April 4, 2006 visit was for an annual examination, and Dr. Kirschner testified that on such an occasion she would question the patient about her medical history and ask "what's going on." (U.S. St. ¶ 38; Kirschner Dep. 23, 26, 28). On that visit Mrs. Hersko mentioned her suspicion that she was pregnant again but a pregnancy test was negative. (U.S. 56.1 St. ¶ 39; Kirschner Dep. 26-27; Krause Decl. Ex. E at 00371). Dr. Kirschner's notes from

9

that visit state that Mrs. Hersko had had "three normal spontaneous vaginal deliveries" (id.), a notation that, according to Dr. Kirschner, must have reflected what Mrs. Hersko had told her. (Kirschner Dep. 32). In light of the notations referring to the pregnancy question, Dr. Kirschner testified that she would have had "some discussion about pregnancy" but did not elaborate further. (Id. at 28-29). She also testified that in some cases she would provide counseling to patients about "the process" of getting pregnant, though the clinic record reflects no such counseling of Mrs. Hersko. (U.S. 56.1 St. ¶ 41; Kirschner Dep. 31).

Despite the professed ignorance of Drs. Kirschner, Kramer and Lanzkowski as to the crucial details of the third delivery, Mrs. Hersko was apparently not refusing to reveal those details to her health-care providers. Specifically, on September 3, 2004, she saw her cardiologist, Dr. Meller. At that appointment she discussed the third pregnancy and communicated the fact of the bleeding. Thus his note for that visit states "delivered herself at home. 'Too fast'. Then went to the hospital and got 2v blood." (Seskin Decl. Ex. Y). A further indicator that the Herskos were not concealing the prior history is the testimony of Mr. Hersko that at the first pre-natal visit with the obstetrician (later identified as Dr. Lanzkowski) on the final pregnancy, he had asked for advice as to whether the

10

pregnancy was too risky, an inquiry triggered by the fact that on the prior pregnancy his wife had nearly died. (Hersko Dep. 96).

On April 24, 2006 Dr. Kirschner saw Mrs. Hersko for an irregular menstrual cycle. (U.S. 56.1 St. ¶ 45; Kirschner Dep. 29-30; Krause Decl. Ex. E at 00370). On the last visit with Dr. Kirschner, which took place on October 23, 2006, the doctor saw her for the same problem. (U.S. 56.1 St. ¶ 46; Kirschner Dep. 30-31; Krause Decl. Ex. E at 00111, 00369).

Throughout the relevant years from 2001 until mid-2005 Mrs. Hersko was seen by a family medicine practitioner at Refuah, Dr. Johannes Weltin. (Weltin Dep. 7-8, 12-13,28, 32-33, 43). He saw her most recently on February 28, 2005 and July 18, 2005. (Id. at 32). On February 28 he referred her to a neurologist for memory issues, and in doing so he characterized her most recent delivery as "uneventful". (Id. at 39-39; Krause Decl. Ex. E at 00361).

Mrs. Hersko was seen by Drs. Kramer and Lanzkowsky during her fourth pregnancy. The first visit was March 20, 2007, and the last was October 9, 2007. Her expected delivery date was October 27, 2007. (Pl. 56.1 St. ¶ 36; Lanzkowski Dep. 35). On the first visit it would have been standard practice for the obstetrician to review

the patient's medical records for pertinent history. (Lanzkowski Dep. 25-26). Dr. Lanzkowsky saw her and recorded that her first two deliveries had been "rapid" and that her third had been "extra-mural". The notes do not refer to substantial bleeding from the last pregnancy, although recording such a fact, if known to the doctor, would have been the standard practice. (Pr. Defts. 56.1 St. ¶ 27; Berman Decl. Ex. J at 00030-34; Pl. 56.1 St. ¶ 38; Lanzkowski Dep. 46).

Despite the absence of any such reference in the doctor's notes, Mr. Hersko testified that he had attended that session and had raised with the doctor his concern about the safety of the latest pregnancy in view of the fact that on the prior delivery "my wife almost died." (Hersko Dep. 96). According to plaintiff, the doctor responded that the prior events -- however he understood them -- were no indicator of any risk to Mrs. Hersko on the next pregnancy. (Id. 96-97). The passage in question is as follows:

Q. What do you remember about that discussion?

A. I went there since my wife almost died the previous time, so I went to talk to the doctor about what we should do, whether we should continue or not continue, to ask whether everything is going to be okay.

Q. When you say continue, do you mean continue with the pregnancy?

12

A. Yes, yes.

Q. What did the doctor say to you?

A. He told me -- the doctor said I shouldn't worry, everything is okay.

Q. Do you remember anything else that the doctor said?

A. I asked what happened the previous time, why did it -- why was it like that the previous time, he said it just happened, it happened, so it happened.

(Hersko Dep. 96-97). Although Mr. Hersko was not specifically asked whether he had referred to the bleeding during his interchange with the doctor (see id. 96-98), on this motion we must read this ambiguity in favor the plaintiff, and plainly a trier of fact could infer that this fact was mentioned.

The last pre-natal visit occurred on October 9, 2007, when Mrs. Hersko was 37 weeks and 3 days into her pregnancy. At the time she was 1 centimeter dilated, and the doctor scheduled her next appointment for October 16. The obstetricians planned to induce labor on October 22, 2007 -- which was 39 weeks and 2 days into the pregnancy.[4] According to the doctors, the goal was to avoid an extra-mural delivery. (Pr. Defts. 56.1 St. ¶ 37; Berman Decl. Ex.

---

[4] Mrs. Hersko's estimated due date was October 27, 2007. (Pr. Defts. 56.1 St. ¶ 27; Pl. 56.1 St. ¶ 36). The scheduled date for induction was October 22 (see id. ¶ 30), which was therefore timed at 39 weeks and two days.

J at 00027-32; Lanzkowski Dep. 35).

Instead, on October 11, 2007 -- that is, 37 weeks and six days into the pregnancy -- one of the Hersko children called Mr. Hersko to come home, and he arrived about 20 minutes later, and observed his wife, unconscious on the toilet. He called for an ambulance, which arrived within one or several minutes. (Hersko Dep. 117, 142, 150-51, 160). The ambulance crew recorded finding her "slumped on toilet in restroom copious amounts of blood on patient, patient's stockings and in toilet." (Seskin Decl. Exs. W at 00121 & X). They also found the newly-born baby in the toilet, with the cord and placenta still attached. (Id.). The crew measured no pulse or blood pressure. (Id.).

The ambulance took Mrs. Hersko to Good Samaritan Hospital, where she arrived less than 30 minutes after Mr. Herko had called Hatzolah. Hospital staff could measure no pulse and were unable to resuscitate her; she was pronounced dead shortly thereafter, although the baby survived. (Seskin Decl. Ex. W at 00127). The Emergency Room physician wrote that she had been found unconscious "with copious amounts of blood throughout" and noted further that on the prior pregnancy "she also nearly exsanguinated as well that time." (Id.). The "Anatomical Donor Screening" form states that the

14

cause of death was "hemorrhage", and the death certificate recites
the cause of death as "bleeding diathesis complicating unaided live
childbirth." (Id. Ex. W at 00131). For religious reasons, no
autopsy was performed. (Hersko Dep. 182-83).

## II. Plaintiff's Contentions

Based on a summary of known facts and a set of opinions by
plaintiff's expert, Dr. Gideon G. Panter, a board certified
obstetrician and gynecologist, and by Dr. Sanford Kempin, a
hematologist, plaintiff contends that Drs. Weltin, Kirschner,
Lanzkowski and Kramer deviated from accepted medical practice in
their dealings with Mrs. Hersko and that their errors were the
proximate cause of her death.[5] The first set of errors that Dr.
Panter attributes to all four is that they failed to obtain or
document the relevant history of Mrs. Hersko's third delivery,
notably the heavy bleeding that she suffered while at home. He
asserts that they were obligated to obtain the details from Nyack
Hospital and, at the very least, from Mrs. Hersko, and it appears

---

[5] Defendants ask the court to disregard Dr. Panter's Rule 56
affidavit -- at least with respect the his discussion of the
cause of death -- as inappropriate supplementation of his expert
report and deposition testimony. (See U.S. Mem. 7). We decline to
do so, finding the affidavit to be sufficiently consistent with
his report and deposition testimony.

15

that they did not do so. (Panter Aff. ¶¶ 27-33).

Plaintiff further accuses Drs. Kirschner, Lanzkowski and Kramer of failing, in the wake of the third birth, to advise Mrs. Hersko of the dangers of any future pregnancy, an obligation that he states is incumbent on the treating gynecologist in this circumstance, as well as on the obstetricians, one of whom saw Mrs. Hersko in June 2004 for a post-partum visit. In this regard he states that she should have been told that, in view of her repeated failure to recognize contractions, she was at risk of an extramural delivery, and in view of her prior major bleeding, that such a scenario posed very serious medical risks. (Id. ¶¶ 34-40).

Warnings aside, Dr. Panter further asserts that the plan devised by Mrs. Hersko's obstetricians for the fourth birth was inadequate in view of (1) the major bleeding at the time of her third delivery and (2) her pattern of early deliveries with no awareness of contractions, reflected in the history of her first and third deliveries. Specifically, the doctors planned to induce delivery at 39 weeks and two days, whereas her first delivery was at 36 weeks, and her third was at 39 weeks and one day. She ultimately gave birth the final time at 37 weeks and six days, and, according to Dr. Panter, she should have been closely monitored far

16

earlier, whether by way of an extended hospital stay or by use of a nurse or mid-wife or nurse's aide or simply another adult during the weeks when she was vulnerable to an early, at-home birth and to heavy bleeding. (Id. ¶¶ 43-51).

Plaintiff also asserts, based on the report of Dr. Kempin (Seskin Decl. Ex. U) as well as Dr. Pantin's submissions (Panter Aff. ¶¶ 58-62), that these three doctors deviated from accepted standards of treatment by not arranging for Mrs. Hersko to be tested for coagulopathy. The need for such testing, they say, arose from the fact that up to half of those who have Noonan's Syndrome suffer from coagulopathy, and it poses grave risks in the event of a delivery outside a hospital. They imply that if that testing had been done and had yielded a positive result, the obstetricians and gynecologist would have had still more reason both to warn Mrs. Hersko of the risks of a fourth pregnancy and to ensure a more rigorous monitoring regime for her in the later stages of her fourth pregnancy.

As for causation, Dr. Panter suggests that all indications are that Mrs. Hersko suffered a major hemorrhage in the course of her fourth delivery. Unlike the third birth, at the time of her last delivery her husband was not home, and the doctor opines that she

probably suffered cardiac arrest from the excessive bleeding. Thus he posits that the failure of the doctors to obtain the detailed history of the third delivery led them to design an inadequate program to protect Mrs. Hersko, whose Noonan's Syndrome exposed her to the risk of excessive bleeding and who had in fact faced a similar medical crisis due to hemorrhaging during her third delivery. (Id. ¶¶ 51-57).

III. Defendants' Motions

The United States is sued under the FTCA based on the status of the Refuah clinic as a recipient of federal funding. The two defendant doctors whose performance is thereby subject to review under the statute are Drs. Weltin and Kirschner, both of whom were employed by the defendant clinic. As for the defendant obstetricians -- who were affiliated with New Square Ob/Gyn Associates -- because they were providing obstetrical services at the clinic as employees of an independent contractor, the United States takes the position that their performance is not subject to a claim under the FTCA. (U.S. Reply Mem. 12-14).

In seeking summary judgment, the United States concedes that there are triable issues of fact regarding whether the performance

of either Dr. Kirschner or Dr. Weltin deviated from accepted medical standards. (U.S. Mem. 19). Instead, it presses two basic arguments. First, it contends that neither physician had a duty to Mrs. Hersko with respect to her pregnancies, and that therefore any hypothesized deviation by them could not trigger liability. In this regard, defendant notes that as a family-practice physician, Dr. Weltin never saw or treated Mrs. Hersko for any medical issues related to pregnancy or the conditions that might have contributed to the crises that beset her at two of her deliveries. Indeed, he simply saw her occasionally for miscellaneous conditions such as memory issues and dry skin, and did not see her after mid-2005. As for Dr. Kirschner, defendant relies on her testimony that, although a trained obstetrician as well as gynecologist, she did not involve herself in her patients' pregnancies and focused instead exclusively on gynecological issues. In this respect, defendant also notes her testimony that although she might on occasion discuss pregnancy issues, she did not do so routinely, and that she had no reason to believe that pregnancy risks had come up in her treatment of Mrs. Hersko, particularly because her records did not reflect a crisis in her prior deliveries. (U.S. Mem. 14-19; U.S. Reply Mem. 3-5).

As for the question of proximate cause, the United States

argues that the failure of either of these two physicians to learn the details of Mrs. Hersko's third delivery (or else their failure to document that which they might have learned) cannot be shown to have caused the crisis that led to her demise on the fourth delivery. In substance, defendant makes three points in this respect. First, it says, even if the details of the third delivery had been known to Dr. Kirschner, and she had advised Mrs. Hersko about the risks of another pregnancy, plaintiff cannot show that Mrs. Hersko would have chosen -- with the presumably required concurrence of her husband and perhaps the advice of their rabbi -- not to undertake another pregnancy. Second, defendant asserts that even if those details of the prior delivery had been documented by Dr. Kirschner or Weltin and thus made available to, and known by, the obstetricians, Dr. Lanzkowski testified that he would not have pursued a different program from the plan that he followed, that is, to induce pregnancy at 39 weeks and two days. Third, the United States argues that in any event plaintiff cannot establish that Mrs. Hersko's death was attributable to excessive bleeding -- a contention that seems to be premised on (a) the absence of an autopsy, (b) the lack of clarity as to the precise amount of bleeding observed when Mrs. Hersko was found on the toilet, (3) the evidence that her heavy bleeding on the occasion of the third delivery was not attributable to a coagulopathy, and (4) the

existence of other possible causes for her death. (U.S. Mem. 19-29; U.S. Reply Mem. 6-9).

As for the other five defendant doctors -- Drs. Kramer, Lanzkowki, Kerenyi, Scher and Grazi -- and New Square Associates, they too pursue summary judgment. Drs. Kerenyi, Scher and Grazi note that they were not involved in either of the last two pregnancies and deliveries of Mrs. Hersko, and Dr. Scher reports no involvement in any of her treatment. (Pr. Defts. Mem. 5-7; Pr. Defts. Reply Mem. 3). In addition, they cite the fact that even plaintiff's obstetrical expert, Dr. Panter, does not suggest that they deviated from accepted medical standards or otherwise contributed to the death of Mrs. Hersko. (Pr. Defts. Mem. 6). As for Drs. Kramer and Lanzkowski, they argue that plaintiff cannot demonstrate any deviation by them from accepted medical standards in their treatment of Mrs. Hersko following her third pregnancy or during her fourth. In this respect they suggest that they did not know of any unusual aspects of the third delivery other than its occurring at home, with Mrs. Hersko apparently unaware of her contractions, and that they properly prepared for dealing with that fact by planning an induced birth at 39 weeks and two days. They also argue that the alternatives proposed by Dr. Panter for either a hospital confinement or close monitoring at home were not called

for and are not part of any medical standard that is generally
recognized in the profession. (Pr. Defts. Mem. 7-10, 12-15).
Finally, they assert that plaintiff cannot demonstrate causation,
both because their treatment plan would not have changed had they
been aware of the bleeding that accompanied the third delivery and
because there is insufficient proof that their patient died from a
hemorrhage. (Id. 10-12, 15-17; Pr. Defts. Reply Mem. 9-17).


ANALYSIS


Before addressing the two motions for summary judgment, we
briefly summarize the oft-repeated criteria for assessing such
motions.


A. Summary Judgment Standards


The court may enter summary judgment only if it concludes that
there is no genuine dispute as to the material facts and that,
based on the undisputed facts, the moving party is entitled to
judgment as a matter of law. Fed. R. Civ. Pro. 56(c); see, e.g.,
Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Bank of New
York Mellon Corp. v. C.I.R., __ F.3d __, 2015 WL 5234396, *4 (2
Cir. Sept. 9, 2015); Doninger v. Niehoff, 642 F.3d 334, 344 (2d

22

Cir. 2011); Feingold v. New York, 366 F.3d 138, 148 (2d Cir. 2004). "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law [while] [a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Shade v. Hous. Auth. of the City of New Haven, 251 F.3d 307, 314 (2d Cir. 2001) (quoting Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 248 (1986)). Accord Windsor v. United States, 699 F.3d 169, 192 (2d Cir. 2012), aff'd, 133 U.S. 2675 (2013). It is axiomatic that the responsibility of the court in deciding a summary-judgment motion "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986)(citing Anderson, 477 U.S. at 246-51); see also Wilson v. Northwestern Mut. Ins. Co., 625 F.3d 54, 60 (2d Cir. 2010); Howley v. Town of Stratford, 217 F.3d 141, 150-51 (2d Cir. 2000).

The party moving for summary judgment bears the initial burden of informing the court of the basis for his motion and identifying those portions of the "pleadings, the discovery and disclosure materials on file, and any affidavits" that demonstrate the absence of a genuine issue of material fact. Fed. R. Civ. Pro. 56(c); see,

e.g., Celotex, 477 U.S. at 323; Hodge v. City of Long Beach, 433 F.
Appx. 17, *1 (2d Cir. 2011); Koch v. Town of Brattleboro, 287 F.3d
162, 165 (2d Cir. 2002). If the non-moving party has the burden of
proof on a specific issue, the movant may satisfy his initial
burden by demonstrating the absence of evidence in support of an
essential element of the non-moving party's claim. See, e.g.,
Celotex, 477 U.S. at 322-23, 325; PepsiCo, Inc. v. Coca-Cola Co.,
315 F.3d 101, 105 (2d Cir. 2002); Goenaga v. March of Dimes Birth
Defects Found., 51 F.3d 14, 18 (2d Cir. 1995).[6]

If the movant fails to meet his initial burden, the motion
will fail even if the opponent does not submit any evidentiary
materials to establish a genuine factual issue for trial. See,
e.g., Adickes v. S.H. Kress & Co., 398 U.S. 144, 160 (1970);
Fabrikant v. French, 691 F.3d 193, 215 n.18 (2d Cir. 2012);
Giannullo, 322 F.3d at 140-41. If the moving party carries his
initial burden, the opposing party must then shoulder the burden of
demonstrating a genuine issue of material fact on any such

---

[6] If the movant would have the burden of proof on a targeted
claim or issue, he must proffer admissible evidence that, if not
contradicted, would suffice to demonstrate that he is entitled to
judgment on that claim or issue. See, e.g., Giannullo v. City of
New York, 322 F.3d 139, 140-41 (2d Cir. 2003). That is not the
case here since plaintiff bears the burden of proof on all
elements.

challenged element of his claim or defense. See, e.g., Beard v. Banks, 548 U.S. 521, 529 (2006); Celotex, 477 U.S. at 323-24; Santos v. Murdock, 243 F.3d 681, 683 (2d Cir. 2001). In doing so, the opposing party may not rest "merely on allegations or denials" of the factual assertions of the movant, Fed. R. Civ. Pro. 56(e); see also, e.g., Goldstein v. Hutton, Ingram, Yuzek, Gainen, Carroll & Bertolotti, 374 F.3d 56, 59-60 (2d Cir. 2004), nor may he rely on his pleadings or on merely conclusory factual allegations. See, e.g., Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000). He must also "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); see also Bermudez v. City of New York, 790 F.3 368, 373-74 (2d Cir. 2015); Woodman v. WWOR-TV, Inc., 411 F.3d 69, 75 (2d Cir. 2005). Rather, he must present specific evidence in support of his contention that there is a genuine dispute as to the material facts. See, e.g., Celotex, 477 U.S. at 324; Bermudez, 790 F.3d at 373-74; Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998); Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 526 (2d Cir. 1994).

Finally, even if the court does not grant summary judgment co-extensive with the relief sought by any movant, it may provide

partial relief. Moreover, that relief may be as limited as a declaration that one or more material facts are "not genuinely in dispute" and that those facts are deemed "established in the case." Fed. R. Civ. Pro. 56(g); see, e.g., ISC Holding AG v. Nobel Biocare Finance AG, 688 F.3d 98, 125 (2d Cir. 2012)(Straub, C.J., dissenting); Coene v. 3M Co. ex rel. Minn. Mining & Mfg. Co., 2015 WL 5773578, *6 (W.D.N.Y. Sept. 30, 2015).

## B. Assessment of The Motion of the United States

As noted, the United States seeks judgment with respect to the performance of both Dr. Weltin and Dr. Kirschner. It also asserts -- in response to an argument by plaintiff -- that it cannot be held liable for the conduct of the obstetricians because the FTCA does not extend to the torts of independent contractors. We address each of these issues in turn.

## 1. Dr. Weltin

As the United States emphasizes, a defendant may not be held liable in negligence unless he owed a duty of care to the plaintiff and then failed to fulfill that duty. In the context of claims for

medical malpractice, the New York courts[7] have generally adhered to the very generally stated notion that although "physicians owe a general duty of care to their patients, that duty may be limited to those medical functions undertaken by the physician and relied upon by the patient." Burtman v. Brown, 97 A.D.3d 156, 161-62, 945 N.Y.S.2d 673, 677 (1st Dep't 2012). Accord, e.g., Chin v. Long Island College Hosp., 119 A.D.3d 833, 834, 990 N.Y.S.2d 543, 545 (2d Dep't 2014)(citing cases). Generally speaking, if the doctor has not participated in the course of treatment that becomes the subject of the malpractice claim, he will be deemed not to have a duty with respect to that aspect of the patient's care, even if he was treating the patient for other conditions. See, e.g., id. at 833-34, 990 N.Y.S.2d at 545 (emergency room psychiatrist who assessed plaintiff had no duty with respect to the later need for a neurological examination of the plaintiff, as other emergency room doctors were handling that aspect of the treatment). Although the question whether a duty existed is deemed a question of law, e.g., Burtman, 97 A.D.3d at 161, 945 N.Y.S.2d at 677, it will often turn on factual questions, inasmuch as the existence of a duty depends upon "the circumstances of a particular scenario." Id. at

---

[7] Under the FTCA, we look to the law of New York for the substantive requirements pertinent to the claims that plaintiff asserts. See, e.g., Taylor v. United States, 121 F.3d 86, 89 (2d Cir. 1997).

27

162, 945 N.Y.S.2d at 677. See, e.g., Tom v. Sundaresen, 107 A.D.3d 479, 479-80, 966 N.Y.S.2d 434, 435-36 (1ˢᵗ Dep't 2013)(finding triable issue as to duty based on testimony of two doctors); Maggio v. Werner, 213 A.D.2d 883, 883-84, 623 N.Y.S.2d 424, 425 (3d Dep't 1995)(triable issue based on conflicting testimony of doctor and patient). Indeed, this follows from the stated rule that the scope of the duty depends on the "medical functions" of the doctor and the patient's reliance (or lack thereof) on the doctor. E.g. Burtman, 97 A.D.3d at 161-62, 945 N.Y.S.2d at 677.

In this case plaintiff fails to proffer a factual basis for inferring a duty on the part of Dr. Weltin that pertains to her obstetrical care or related family-planning issues. He saw her on various occasions for specific conditions that were completely unrelated to the matters that at least arguably led to her death. Indeed, the very limited role that he played in her health care is underscored by the fact that he never saw her after mid-2005, nearly two years before her last pregnancy and treatment for it.

Since Dr. Weltin cannot be shown to have had a duty to Mrs. Hersko that is pertinent to the events leading to her death, summary judgment must be granted to the United States insofar as plaintiff's claim rests on actions or inactions of that doctor.

## 2. Dr. Kirschner

Plaintiff accuses Dr. Kirschner of falling short in failing to document, or perhaps even ask about, the details of her patient's pregnancy and delivery history, and her apparent failure to address with Mrs. Hersko the risks of a future pregnancy posed by the crisis that she faced at the time of her third delivery. Defendant argues that Dr. Kirschner's performance in these respects cannot trigger liability under the FTCA both because she owed Mrs. Hersko no duty with respect to her pregnancy and because any deviation by Dr. Kirschner from medical standards was not a proximate cause of Mrs. Hersko's death. We conclude that there are triable disputes with respect to both issues.

Plaintiff also asserts that Dr. Kirschner should have had her tested for coagulopathy as a consequence of her diagnosed Noonan's Syndrome. Defendant argues that there is no basis for the hypothesized coagulopathy-testing requirement since the uncontroverted evidence shows that Mrs. Hersko did not suffer from that condition. As to this controversy, we agree with defendant that plaintiff cannot show causation.

Dr. Kirschner served as Mrs. Hersko's gynecologist for a

29

number of years between her third and fourth pregnancies. Although trained as an obstetrician, Dr. Kirschner testified that she was providing only gynecological services during the relevant period. The record, however, would allow a trier of fact to find that such services could encompass issues relating to future pregnancies, including potential risks and issues affecting how and whether to become pregnant. Indeed, in testimony Dr. Kirschner vaguely alluded to the potential for a more expansive role than simply reviewing the state of a patient's reproductive and related systems. Thus she testified that she would sometimes discuss future pregnancies with patients and would ask about past history as relevant. In the case of Mrs. Hersko, she had apparently sought from some source at least a brief description of Mrs. Hersko's history -- seemingly on two occasions, as reflected in her notes -- and had engaged in some sort of discussion with her about pregnancy, as of the time of her false pregnancy, but she did not recall the details of any of her dealings with Mrs. Hersko. (Kirschner Dep. 22). As for whether she had ever discussed the details of prior pregnancies or the risks of any future one with Mrs. Hersko -- as distinguished from other patients -- the record is opaque. As noted, the doctor had no memory of her dealings with Mrs. Hersko and professed no knowledge of the circumstances of her patient's third delivery. Her notes of her first visit after the third delivery simply mention three prior

30

pregnancies and deliveries. (U.S. 56.1 St. ¶ 37; Krause Decl. Ex. E at 00374). Her notes from a later visit, on April 4, 2006, recite that the patients' prior pregnancies involved "3 NSVD", or "normal spontaneous vaginal deliveries" (Krause Ex. E at 00371), and Dr. Kirshner stated that such a notation would represent what the patient told her. In any event, Mrs. Hersko obviously cannot offer her own account.

In assessing duty in this context, we note that, at a minimum, a gynecologist has an obligation -- as do doctors in other specialities -- to obtain a patient history pertinent to the doctor's area of treatment. (E.g., D'Alton Dep. 124-26). Indeed, Dr. Kirschner acknowledged that she would ask -- whether generally or specifically -- for an account of the patient's history. Moreover, it appears unavoidable that gynecologists treating a patient who has had one or more problematic pregnancies would be expected by the patient to be up-to-date on the circumstances of those events, particularly if there was a potential for the patient to become pregnant again. Indeed, in that scenario the patient would presumably have only the gynecologist with whom to discuss whether and when to undertake a future pregnancy or to use birth-control methods unless she were still in touch with her obstetrician. Since, however, the role of the obstetrician is

generally confined to the treatment of an actual pregnancy, his (or her) advice on the topic would most likely be received only after pregnancy is confirmed.[8] In addition, to the extent that the gynecologist has responsibility for the condition of the patient's reproductive and related systems, the circumstances of a recent problematic delivery (which in this instance involved heavy bleeding as well as an extramural delivery), would seem to suggest the need for the gynecologist to have access to the medical records of that delivery, if for no other reason, to provide context for assessing the state of the patient's reproductive and related systems. Finally, from the limited record before us a trier of fact could conclude that if Dr. Kirschner had made herself aware of the circumstances of the third delivery and so indicated to Mrs. Hersko, her patient would have been induced to consult with her about the significance of those events and their potential impact on any future pregnancy.[9]

---

[8] Indeed, in this case that sequencing is reflected in the fact that when Mrs. Hersko thought (incorrectly) that she was pregnant, she went to see Dr. Kirschner, not the obstetricians who had supervised her prior pregnancies. (Krause Decl. Ex. E at 00371).

[9] It bears mention that although the note of the November 16, 2006 visit recites that the three prior deliveries were "normal", that does not compel the trier of fact to determine that Dr. Kirschner did not need to obtain the correct history. The file itself contained the note from Dr. Kramer referring to the extramural nature of the third delivery and Mrs. Hersko's lack of

Insofar as plaintiff may be heard to argue that Dr. Kirschner also had a duty to offer advice on the risks of a future pregnancy, defendant appears to take the position that any such obligation would depend on whether the patient sought such advice from the doctor. (E.g., U.S. Mem. 18). Defendant argues that there is no evidence that Mrs. Hersko sought such information from Dr. Kirschner or that the doctor provided it. There is no direct evidence of such an inquiry, a circumstance that may be attributable to the death of Mrs. Hersko, Dr. Kirschner's lack of memory of her treatment of Mrs. Hersko and the evident incompleteness of her notes about the patient's pertinent history. The question is whether there is nonetheless sufficient circumstantial evidence from which a trier of fact might conclude otherwise and, if not, whether the absence of such a discussion relieves Dr. Kirschner of the duty that she otherwise would have

_____

awareness of contractions, thus contradicting the later notation by Dr. Kirschner that all prior deliveries were "normal". In addition, since there is documentation that both Mrs. Hersko and her husband referred specifically to the abnormal nature of the delivery on two separate occasions to two different doctors, the trier of fact could infer that Dr. Kirschner's notes from November 16, 2006 did not accurately describe anything that the patient had told her. Finally, even if it could be inferred, to the contrary, that Mrs. Hersko did represent to Dr. Kirschner that her prior deliveries had been normal, that would merely create a triable issue about notice to the doctor, and that goes to the question of whether she departed from accepted treatment standards, a category of issues as to which the United States is explicitly not seeking summary judgment.

had.

There is insufficient evidence that either the doctor or Mrs. Hersko raised the issue with each other. To conclude otherwise, the trier of fact would be reduced to rank speculation. That said, the presumed absence of such a discussion is not entirely irrelevant for purposes of the triable issues in the case. If the trier of fact found that the doctor's failure to elicit the details of the third delivery -- either from Nyack Hospital records or from Mrs. Hersko -- was a deviation from accepted medical practice, then he must also consider whether Dr. Kirschner, if knowledgeable about the circumstances of that prior delivery, would have been obliged to address the question of future risk.[10]

In addition, Dr. Kirschner's testimony -- vague as it is -- appears to have left open the possibility that the question of a future pregnancy had been raised. Thus she observed that she had talked to Mrs. Hersko about her history, and her notes suggest some sort of discussion (or else a review of the file by Dr. Kirschner)

---

[10] The record would certainly permit a trier of fact to find that the Herskos were seeking a fourth pregnancy, and that Dr. Kirschner was aware of that fact during the period leading up to the final pregnancy. Indeed, we note that on at least one occasion Mrs. Hersko saw the doctor precisely to determine whether she had become pregnant.

of past events on at least two visits. (Krause Decl. Ex. E at 00371, 00374). Moreover, as noted, the note of Dr. Kramer referring to the Nyack Hospital phone call was in the file, thus putting Dr. Kirschner on notice of the fact that the prior delivery had been abnormal.

In addition, in circumstances in which a patient may be medically or otherwise unsophisticated, it is open to question whether the doctor's duty is defined solely by whether the patient herself raises a question about issues suggested by the medical record available to the doctor. If that record shows a potential for risk in an area within the training and expertise of the doctor, it can fairly be found that the doctor owes a duty to the patient to address the issue.

Under the circumstances, we conclude that there are triable issues pertinent to whether Dr. Kirschner had a duty to Mrs. Hersko to obtain and document the details of the prior deliveries and to raise the question of risk for any future pregnancy. There remains, however, the question of whether the doctor's alleged deviations from accepted medical practice -- either the failure to document the details of the third delivery or the failure to warn Mrs. Hersko of the risks of future pregnancies -- could be found at

trial to have proximately caused Mrs. Hersko's death.[11]

In assessing causation, we must determine whether a trier of fact could conclude that an alleged deviation from standards of practice "was a substantial factor in producing the injury." <u>Arkin v. Resnick</u>, 68 A.D.3d 692, 695, 890 N.Y.S.2d 95, 98 (2d Dep't 2009). In support of its motion, the United States argues that plaintiff cannot satisfy this standard for a variety of reasons.

Among other arguments, defendant says that we cannot determine what was the cause of death, and it asserts that Dr. Panter has conceded as much. By implication, if her death was not a result of bleeding, then the failure by the medical staff to learn of the prior bleed was inconsequential for causation purposes. (U.S. Mem. 25). In further support of this argument, defendant suggests that

---

[11] As noted, plaintiff also appears to assert that Dr. Kirschner had a duty to determine whether plaintiff, because of the Noonan's Syndrome, had a tendency to coagulopathy. The short answer seems to be that there is not sufficient evidence to infer that she had that complication. Indeed, the EMS and Nyack Hospital records pertinent to the third delivery suggest otherwise -- that the massive bleeding derived from uterine atony and the initial absence of medications that would have stimulated such contraction. In addition, there is no evidence in the record that Mrs. Hersko ever in the past suffered from the sort of bleeding or bruising that might be emblematic of a coagulopathy. Hence it cannot be said that the failure to conduct the coagulopathy studies was causally related to her death.

obtaining the details of the third delivery might not have persuaded Dr. Kirschner of any need for further inquiry or warning to Mrs. Hersko. (Id. 26).

Defendant also notes that counseling Mrs. Hersko not to get pregnant would not necessarily have deterred her, and that in any event Dr. Panter agreed that she could have undergone a safe pregnancy if the obstetricians had properly planned for the delivery. (Id. 27-28).

We do not agree with defendant regarding the advice-of-risk claim. There is no direct evidence as to what the Herskos would have done if given a timely warning by Dr. Kirschner. Nonetheless, we do note that Mr. Hersko testified that following the discovery of his wife's last pregnancy, he attended her first pre-natal conference, in March 2007, with the obstetrician,[12] and asked the doctor what they should do in view of the problems encountered in the prior delivery. That testimony is evidence at least that the Herskos were concerned about risk, and it could be viewed as evidence that they were willing to contemplate a termination of

_____

[12] At Mr. Hersko's deposition he could not recall which doctor he and his wife saw on that occasion (Hersko Dep. 97), but the medical records and deposition testimony reflect that it was Dr. Lanzkowski. (See Lanzkowski Dep. 25).

pregnancy -- which would have avoided her death -- or a request to the obstetricians for very stringent measures to protect Mrs. Hersko at the time of delivery. In this respect a trier of fact could infer that, if armed with such a warning by her gynecologist, Mrs. Hersko might have elicited a better treatment plan from the obstetricians and that might also have spared her life. Although there are obvious imponderables in either assessment, based on the circumstantial evidence a trier of fact could conclude, by a preponderance of the evidence, that a warning to Mrs. Hersko by her gynecologist would likely have avoided her death.[13]

---

[13] The fact that Dr. Lanzkowski testified that even if he had known of Mrs. Hersko's earlier crisis, he would not have altered his approach -- an assertion echoed by Dr. Kramer (Kramer Dep. 90-91) -- does not bind the jury to believe him in this matter. He is a defendant, and thus an interested party in this lawsuit, and hence this aspect of his testimony -- which is evidently self-serving -- must be viewed with caution and may be discredited by the trier of fact even if no evidence is proffered that squarely contradicts it. Indeed, we note that the standard jury instructions specify that the testimony of interested witnesses is to be treated with caution and that, in assessing credibility, the trier of fact is free to discount testimony that appears, for whatever reason, implausible even if the testimony is not directly contradicted. See generally United States v. Brutus, 505 F.3d 80, 84-85 (2d Cir. 2007). Here, given the fact that Mrs. Hersko underwent a major medical crisis on the third delivery and had had two premature deliveries, one as early as 36 weeks, a trier of fact could conclude that if the obstetricians had been aware of the nature and extent of the crisis that their patient had experienced the last time she delivered, they would have followed a more cautious path that likely would have spared her life.

As for the other causation arguments by defendant -- addressed to Dr. Kirschner's failure to document the third delivery -- they are also not persuasive.

The fact that no autopsy was ordered does not preclude a reasonable trier of fact from finding that the most likely cause of Mrs. Hersko's death was bleeding. The prior history offers sufficient circumstantial evidence for this purpose. Notably, on the occasion of the third birth, Mrs. Hersko had an apparently rapid delivery that was accompanied by massive, and potentially fatal, blood loss, estimated by the experts at between half and two-thirds of her blood supply. A trier of fact could find that she was spared only by the speed of medical intervention; indeed, even the defendants' experts have so opined. (E.g., Mumford Dep. 55; D'Alton Dep. 76-78; see also Aledort Dep. 39). As for the circumstances of her death, the EMS crew noted what appeared to be very substantial bleeding, and a reading of their notes and the hospital records could justifiably lead a trier of fact to infer a similarly substantial blood loss, not the sort of minor bleeding that may accompany even a normal delivery. If the blood loss on the prior occasion was sufficient to threaten her survival despite quick medical attention attributable to the presence in the home of her husband, a trier of fact could fairly infer that a large blood

loss at the next delivery was a related and equally substantial trauma that likely led to her death because her husband was not in a position to summon medical care nearly as quickly as on the prior occasion.

The fact that there was no precise measurement of the blood loss at the time of Mrs. Hersko's death is also not fatal to plaintiff's claim. Obviously the absence of a precise measurement leaves open the possibility that it was not a fatal amount and that some other cause intervened to bring about her demise. Nonetheless, in view of the specific findings with regard to the earlier delivery and the evidence that at least suggests that she was bleeding heavily once again when she died, there is a triable issue as to causation.[14]

---

[14] We note that defendant invokes the asserted fact that at deposition Dr. Panter indicated some uncertainty as to the cause of death, a caution that is supposedly in some tension with his statements in his expert report and his affidavit on the current motions. (U.S. Mem. 25 (citing Panter Dep. at 93, 95). In fact, however, in that deposition testimony Dr. Panter repeatedly stated that he believed that Mrs. Hersko had died of a hemorrhage, although he could not be absolutely certain of that. At most, this testimony is appropriate grist for cross-examination but does not preclude plaintiff's current reliance on both the report and the affidavit. In this regard we acknowledge a line of Second Circuit decisions that have held that a party may not avoid summary judgment by the use of affidavit testimony by a party that is contrary to the affiant's prior deposition testimony. See, e.g., Mack v. United States, 814 F.3d 120, 124-25 (2d Cir. 1987). That said, the cited answers by Dr. Panter at his

40

The further fact that defendant can speculate as to other possible causes of death or speculate that Dr. Kirschner, if advised of the details of the third delivery, would have chosen to do nothing, does not justify summary judgment in defendant's favor. A trier of fact need only find by a preponderance of the evidence that Mrs. Hersko died from blood loss and its physical impact, and, in view of the fact that she apparently had a near-death experience on the prior occasion, the trier of fact could reasonably infer that she succumbed to the effects of such a loss of blood. Moreover, the trier of fact could equally surmise either that Dr. Kirschner would have posed a warning to Mrs. Hersko or that a failure to do so would have amounted to professional negligence.

In sum, the motion of the United States is granted with respect to the treatment by Dr. Weltin. As for the performance of Dr. Kirschner, the motion is granted with respect to her alleged failure to order a coagulopathy test, and is otherwise denied.

---

deposition are simply not directly contradictory to -- or indeed at all inconsistent with -- his prior and subsequently offered opinion as to the cause of death. In any event, as noted, we must read evidence that is ambiguous in favor of the party opposing summary judgment, and in this case his deposition answers, at most, simply conceded a lack of absolute certainty as to the cause of death. That is not contrary to his stated belief that Mrs. Hersko died from cardiac arrest caused by the bleeding.

### 3. The Scope of FTCA Coverage

There remains one additional issue raised by plaintiff's opposition papers, in which he argues that the United States should also be held directly liable under the FTCA for any deviations by the obstetricians in their treatment of Mrs. Hersko. (Pl. Mem. 46-49). This argument fails because the FTCA waives sovereign immunity only for the conduct of "any employee of the Government", 28 U.S.C. § 1346(b)(1), and does not cover the torts of independent contractors hired by the Government. 28 U.S.C. § 2671. See, e.g., United States v. Orleans, 425 U.S. 807, 814 (1976); Roditis v. United States, 122 F.3d 108, 111 (2d Cir. 1997)(per curiam); Fisko v. U.S. Gen. Servs. Admin., 395 F. Supp.2d 57, 62 (S.D.N.Y. 2005). More specifically, the provisions of the Federally Supported Health Centers Assistance Act, 42 U.S.C. § 233(g), provide that health centers, such as Refuah, that receive federal funding are deemed to be employees of the United States for purposes of the FTCA, and that the FTCA covers torts by employees of such health centers, as well as by physicians who directly contract with the health center. 42 U.S.C. § 233(g)(1)(A). It does not, however, waive Government immunity from liability for torts committed by entities that contract with a federally-funded health center, nor does it waive immunity for torts by employees of such entities. See, e.g., Fan ex

rel. Zu Hua Chen v. United States, 2007 WL 10323304, *13 (S.D.N.Y. April 3, 2007). Accord, e.g., Rosenblatt v. St. John's Episcopal Hosp., 2012 WL 294518, *4-5 (E.D.N.Y. Jan. 31, 2012). There is no dispute here that the Refuah clinic, which is deemed an arm of the United States for FTCA purposes as the recipient of federal funding (U.S. 56.1 St. ¶¶ 8-10), did not employ the obstetricians but rather contracted with New Square for the services of its obstetricians, Drs. Kramer and Lanzkowski. (Pl. 56.1 St. ¶ 2). There is also no suggestion that the United States exerted direct control over how New Square and its physicians performed their medical functions, and hence plaintiff cannot avail himself of the so-called "control test" to demonstrate that the Government in effect converted an independent contractor into an employee. See, e.g., Leone v. United States, 910 F.2d 46 49 (2d Cir. 1990); Haskin v. United States, 2013 WL 4761110, *5 (E.D.N.Y. Sept. 4, 2013). It follows, then, that the United States cannot be held liable for the torts, if any, of New Square or the doctors whom it employed.[15]

---

[15] Plaintiff's invocation of the state-law concept of "apparent agency" does not save his argument. Federal law controls the scope of the waiver of sovereign immunity, and the FTCA makes no allowance for an expanded scope of Government liability. In this respect, we note that "apparent agency" under New York law allows a principal to be held liable for the acts of its independent contractor based on the independent contractor having an appearance of authority to bind the principal, e.g., Sampson v. Contillo, 55 A.D.3d 588, 590, 865 N.Y.S.2d 634, 636-37 (2d Dep't 2008), and thus conflicts with the FTCA insofar as that

C. The Motion of the Private Defendants

The remaining defendants also seek summary judgment. In doing so they argue that Drs. Kerenyi, Scher and Grazi had no involvement in Mrs. Hersko's third or fourth pregnancies and deliveries. (Pr. Defts. Mem. 5-7). As for Drs. Kramer and Lanzkowski, they assert that plaintiff cannot sustain his contention that they deviated from governing standards of care, and they further argue that he is unable to demonstrate that any such deviation was a proximate cause of Mrs. Hersko's death. (Id. 7-17). We grant the motion with respect to Drs. Kerenyi, Scher and Grazi and otherwise deny it.

There is no dispute that Drs. Kerenyi, Scher and Grazi had no involvement in the pertinent treatment of Mrs. Hersko. (Berman Decl. Exs. J, L, M, U & V).[16] Not surprisingly, then, plaintiff's obstetrical expert, Dr. Panter, excludes all three from his assessment that Mrs. Hersko was denied professionally adequate treatment, and plaintiff's expert hematologist also does not refer to these doctors. (Id. Exs. H, I). In short, summary judgment must

---

statute precludes Government liability for the acts of such independent contractors.

[16] Indeed, it appears that Dr. Scher never treated her at all, and that the other two physicians were involved only in her first and second deliveries. (Berman Decl. Exs. J, K, U & V).

be granted to these three defendants.

As for Drs. Kramer and Lanzkowski, they argue, in substance, that they did not deviate from accepted medical treatment standards and that any such alleged deviation cannot be shown to have been the proximate cause of her death. We conclude that there are triable disputes as to the facts material to both of these issues.

In addressing the standard of care, these defendants focus on two points. First, they press the notion that there is no indication that Mrs. Hersko suffered from coagulopathy. They note in this respect that although Mrs. Hersko had probably been tested for that condition when still an infant, the records of her medical history give no indication of such a diagnosis. (Pr. Defts. Mem. 7). In addition, they observe, by way of the testimony of Dr. Kramer, that if she had suffered from such a condition, it would likely have manifested itself at all four of her deliveries, and yet the only noted bleeding occurred on the third and fourth ones. (Id. 7-8). They further opine, citing the testimony of two obstetrical experts and a hematologist, that the most likely explanation for the bleeding on the third delivery was uterine atony, a condition that involves a failure by the uterus to contract after the birth. (Id. 9-10 (quoting opinions of Drs.

Kirshenbaum, Ahmad and Mumford. <u>See</u> Berman Decl. Exs. C, D, F & S).

With this premise established, defendants further argue, based on their obstetrical expert, that the plan designed by Drs. Kramer and Lanzkowski for a delivery at 39 weeks and two days was reasonable. They further assert that such alternative measures as early hospitalization or a 24-hour-a-day watch by a nurse or midwife or nurse's aide, as suggested by Dr. Panter, are not within the applicable standard of care. (Pr. Defts. Mem. 8-9 (quoting testimony of Dr. Kirshenbaum).

As for causation, the defendants emphasize that because of the lack of an autopsy there can be no certainty as to the cause of Mrs. Hersko's death and no proof that Mrs. Hersko suffered from coagulopathy. Their experts note that there was also no precise measure of the amount of blood loss at the final delivery, and that therefore it cannot be assumed that she suffered a hemorrhage (<u>id.</u> 15); indeed, one of them speculates as to other possible causes -- "a catastrophic event such as an amniotic fluid or pulmonary embolism". (<u>Id.</u> 11 (quoting Berman Decl. Ex D (Dr. Ahmad)). As for the failure of the obstetricians to obtain the medical records pertaining to the third delivery, they cite the testimony of Dr. Lanzkowski to the effect that even if he had known the details of

46

that event, he would have adhered to the plan that he and Dr. Kramer had formulated. (Id. 11-12 (quoting Dr. Lanzkowski Dep. 69-71); accord Kramer Dep. 90-91). In short, they say, the failure to determine the details of the third delivery, including the substantial bleeding, did not affect the fatal result of the next delivery.

This proffer narrows, but does not eliminate, the area of genuine dispute pertinent to plaintiffs' claims against the obstetricians. We agree that plaintiff is unable to establish a triable dispute as to whether the failure by the obstetricians to test Mrs. Hersko for coagulopathy constituted a deviation or was a proximate cause of her demise. Simply stated, there is not only no indication that she had such a condition, but the evidence strongly suggests otherwise, since her medical history is devoid of the sorts of indicators of that condition that would be expected, including bleeding on dental treatment, as well as on all prior deliveries. Moreover, the records pertaining to the third delivery strongly indicate that uterine atony was responsible for the very substantial bleeding on that occasion, as she improved drastically after being given multiple doses of Pitocin.

The balance of the arguments pressed by defendants, although

they are grounded in evidence and may be accepted by the triers of fact, do not demonstrate an absence of triable issues. This follows with respect to both the deviation question and the causation issue.

The failure of the obstetricians to obtain the details of the third delivery -- a pregnancy for which they were also treating obstetricians -- can readily be found by a reasonable trier of fact to be a deviation from accepted medical practice. The plaintiff's expert so states, and common sense supports that opinion. Moreover, in this case the obstetricians should have been on notice that something had gone wrong on the prior delivery, at the very least because they had to know that the delivery was outside the hospital and occurred without the mother's awareness of contractions, as communicated by someone at Nyack Hospital. Moreover, a trier of fact could also infer that whoever communicated that information to Dr. Kramer would also have informed him that Mrs. Hersko had suffered a major blood loss; indeed, it would seem reasonable to infer that Dr. Kramer, even if initially told only that Mrs. Hersko had given birth at home and had been unaware of contractions, would have asked for further details of her condition. Yet the note, which was included in Mrs. Hersko's Refuah file, offers no further information, and the balance of the medical records of Refuah are

devoid of any reference to those events.

In addition, even if Dr. Kramer had not thought at the time of the phone call to obtain Mrs. Hersko's records from Nyack -- perhaps because after her delivery he no longer considered that she was his responsibility -- that could scarcely be the case when she returned in 2007, pregnant and seeking the care of the same obstetricians. Moreover, even if it had slipped the doctors' memories that Mrs. Hersko's third delivery had been at home and accompanied by a lack of awareness of contractions -- the latter also a phenomenon featured at her first delivery, which was handled by Dr. Kramer -- a review of Mrs. Hersko's file would have unearthed the note about the Nyack Hospital call and reminded these obstetricians to obtain the details of the last delivery.

Furthermore, the triers of fact could find that, apart from the failure of obtain those records, the obstetricians fell down on their responsibilities by not eliciting the facts from their patient. At certain points defendants seem to imply that perhaps Mrs. Hersko was not forthcoming about that event, since the records created by the gynecologist and the obstetricians do not refer to those details -- and, indeed, the notes by the gynecologist refer to "normal" deliveries -- but the triers of fact could well infer,

to the contrary, that the doctors never asked her, or if they did ask, she provided the details (as she unquestionably had done to her cardiologist) and that they failed to note them or to remember them.

In this respect it bears recalling that Mr. Hersko testified that he had attended the first pre-natal visit in March 2007, with Dr. Lanzkowski, and had raised his concerns, because his wife had "nearly died" the last time, and that the doctor had simply brushed his concerns aside. From that testimony the triers of fact could find that the obstetricians were uninterested in, or dismissive of, risk factors from the prior incident even though put on notice of them.

As for defendants' focus on the absence of evidence that Mrs. Hersko suffered from coagulopathy, their argument fails to grapple with the question of what implications the bloody course of the third delivery would still pose for her safety at the fourth delivery, even if she did not suffer from coagulopathy. As noted, the record reflects that, despite immediate medical attention following the third delivery, Mrs. Hersko lost a large portion of her blood supply, and there is evidence in the record that, if not promptly treated on that occasion, her condition was potentially

50

life-threatening. Indeed, defendants' own experts so state. In short, even if the defendants' experts are correct in surmising that she suffered on the third delivery from uterine atony and that this accounted for the massive blood loss, that condition, which was treated shortly after the third birth, posed what could be found to have been a very serious health risk. If that be the case, then Mrs. Hersko's tendency to give sudden birth without being aware of the warning signs from contractions (this occurred on both the first and third births) left open the prospect that on a future pregnancy she would again give birth suddenly outside the hospital but without the fortuitous presence of her husband or another adult who could summon prompt medical intervention. (Accord Panter Aff. ¶¶ 34-39).

Defendants' remaining argument against any deviation fares no better. Basically their obstetrical expert states that the modes of treatment suggested by Dr. Panter -- a prolonged hospital stay or constant surveillance by a nurse, midwife or nurse's aide -- are not within the standards of treatment recognized in the profession. The first problem with this mode of argument is that Dr. Panter's report and testimony may be viewed as in conflict with this proposition, a conflict appropriately resolved by the triers of fact rather than on summary judgment. Moreover, even if Dr. Panter

does not explicitly state in haec verba that his suggested approaches are commanded by applicable standards of care, his report may fairly be so interpreted, particularly in view of the requirement that we read any ambiguities in the record favorably to the party resisting summary judgement.

In addition, Dr. Panter opines that in any event the plan by Drs. Kramer and Lanzkowski to induce delivery at 39 weeks and two days was inadequate because at least one of Mrs. Hersko's prior deliveries had occurred -- again without noted contractions -- at 36 weeks and the most recent one had also occurred short of 39 weeks and two days. (Panter Aff. ¶¶ 43-47). As plaintiff argues, the defendants' plan rested on the assumption that she would not give birth as early as these two prior deliveries, an assumption that was particularly dangerous in view of (1) her tendency to deliver quickly and without prior warning and (2) her very heavy bleeding on the third delivery. The risk potentially invited by the defendants' plan was that she would give birth outside the hospital and without immediate assistance, and could well bleed as heavily as on the third delivery, with potentially dire consequences.

In sum, the record would permit a trier of fact to conclude that the plan designed by the defendants was indeed inadequate, and

hence summary judgment cannot be granted to them insofar as it rests on the assumption that defendants have made an undisputed showing that they did not deviate from accepted standards.

Defendants' causation argument also cannot prevail on summary judgment. For reasons noted, the fact that there was no autopsy and no precise measure of the amount of bleeding does not preclude a trier of fact from inferring that she suffered from the same heavy bleeding on the final delivery as she had on the third, and that the difference in result was attributable to the fact that she had received prompt medical attention the first time but not the second. As for the testimony of Drs. Lanzkowski and Kramer that, had they known of the details of the prior delivery, they would not have altered the plan for the fourth delivery, that plainly does not preclude a triable dispute. First, as noted, their testimony is self-serving and need not be credited by the trier of fact. Second, even if the defendant obstetricians would in fact not have come up with a more conservative approach if they had been aware of the very heavy bleeding from the prior birth, a trier of fact could well conclude that such a stance would itself have constituted a departure from accepted standards of care, and in such a case he could certainly find that the defendants' refusal to address the risk of delaying induced delivery until 39 weeks and two days, or

foregoing another system of monitoring, was a proximate cause of Mrs. Hersko's death.

In short, the motion for summary judgment by the private defendants is denied with respect to Drs. Kramer and Lanzkowski and New Square except insofar as plaintiff complains of their failure to arrange for coagulopathy testing, and the motion is granted with respect to Drs. Grazi, Kerenyi and Scher.

## D. Plaintiff's Last-Minute "Informed Consent" Claim

Finally, we note that in plaintiff's memorandum he seeks to assert a claim for lack of informed consent. (Pl. Mem. 50-51). This claim is barred as against the United States for failure to include it in his SF-95 claim form, see Krause Supp. Decl. Ex. A, and it cannot be sustained as against any defendant here since plaintiff failed to plead such a claim or its factual premises in the complaint. Indeed, there is no basis for such a claim here, since it must be premised on the defendant having engaged in "some affirmative violation of the patient's physical integrity, such as surgical procedures, injections or invasive diagnostic tests." Karlsons v. Guerinot, 57 A.D.3d 73, 81-82, 394 N.Y.S.2d 933, 938-39 (4th Dep't 1977). Accord, e.g., Martin v. Hudson Valley Assocs., 13

54

A.D.3d 419, 419-20, 785 N.Y.S.2d 700, 700-01 (2d Dep't 2004). <u>See</u> <u>also</u> N.Y. Pub. Health Law § 2805-d(2). Plaintiff never suggests that any defendant violated Mrs. Herso's physical integrity. <u>See</u> <u>Karlsons</u>, 57 A.D.3d at 82-83, 394 N.Y.S.2d at 938-39 (informed-consent claim does not apply to failure of doctor to warn pregnant patient of likelihood of deformed baby).

## CONCLUSION

For the reasons stated, the summary-judgment motions of the defendants are granted in part and denied in part, to the extent stated. The complaint is dismissed as against the United States with respect to the performance of Dr. Weltin. It is also dismissed as against defendant Drs. Kerenyi, Scher and Grazi. The complaint is not dismissed as against the United States with respect to the performance of Dr. Kirschner except for her asserted failure to arrange a coagulopathy test. It is also not dismissed with respect to the claims against Drs. Kramer and Lanzkowski except for their asserted failure to arrange for a coagulopathy test.[17]

---

[17] At two points in plaintiff's memorandum (at pp. 54, 56) he suggests that he is entitled summary judgment on both the failure to obtain medical records and the failure to counsel Mrs. Hersko. Triable issues of fact preclude any such relief.

Dated: New York, New York
      October 20, 2015

MICHAEL H. DOLINGER
UNITED STATES MAGISTRATE JUDGE