UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ARNOLD HERSKO, as Administrator of
The Estate of Rochel Hersko and Arnold
Hersko, Individually,

                    Plaintiff,

        - against -

UNITED STATES OF AMERICA, NEW
SQUARE OB/GYN ASSOCIATES, LLP,
ANDREW KRAMER, JONATHAN
LANZKOWSKY,

                    Defendants.

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

13-CV-3255 (JLC)

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 5/11/17

**JAMES L. COTT, United States Magistrate Judge.**

Plaintiff Arnold Hersko has brought this lawsuit against the United States of America, pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 1402(b), 2401(b), 2671–80, for the wrongful death of his late wife, Rochel Hersko. Plaintiff alleges that the negligence of Dr. Debra Kirschner-Lanzkowsky, Mrs. Hersko's gynecologist and an employee of the United States, was a substantial factor in causing her death. From April 24, 2017, to May 3, 2017, the Court held a bench trial with an advisory jury to determine whether Dr. Kirschner-Lanzkowsky had deviated from the accepted standard of care in her treatment of Mrs. Hersko. After carefully considering the evidence presented at trial, the Court now adopts the jury's advisory verdict and concludes that Dr. Kirschner-Lanzkowsky, and therefore

the United States, is not liable for Mrs. Hersko's death.[1]

Consistent with that conclusion, the Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a), many of which are not disputed by the parties.[2]

## I.    FINDINGS OF FACT

### A.    Mrs. Hersko's Treatment Providers

At all times relevant to Plaintiff's allegations, Mrs. Hersko received certain medical care at the Refuah Health Center ("Refuah"), a federally-supported health care facility in Spring Valley, New York. *See* Amended Answer, dated April 7, 2014, Dkt. No. 53, ¶ 15. Dr. Debra Kirschner-Lanzkowsky, a licensed obstetrician/gynecologist, was employed by Refuah at all relevant times, from November 17, 2003, until July 17, 2008. *See id.* ¶¶ 13–14. During her approximately five years at Refuah, Dr. Kirschner-Lanzkowsky served as the Director of Women's Health. Trial Transcript ("Tr.") at 490:22–491:19. In that capacity, she was responsible for providing gynecological care to her patients, but did not provide any obstetrical care. *See id.* Dr. Kirschner-Lanzkowsky testified that, ordinarily, when patients to whom she was providing gynecological care became pregnant, they would leave her care and go to an obstetrician. *See id.* at

---

[1] Because Plaintiff was not entitled to a jury trial against the United States under 28 U.S.C. § 2402, the Court treated the jury as advisory with respect to the claims against the United States.

[2] The Court read these findings and conclusions into the record following the jury verdict. This written decision adds citations to the record and makes minor editorial changes, but is otherwise identical to the Court's oral decision.

494:2–495:1. Additionally, it was not her practice to have any interaction with the obstetricians regarding their care for her patients. *Id.*

The evidence at trial established that Dr. Kirschner-Lanzkowsky saw Mrs. Hersko at four clinical visits, all between November 2004 and October 2006, and the last time that she saw Mrs. Hersko was on October 23, 2006, nearly one year prior to Mrs. Hersko's death. *See* Government's Exs. ("Gov. Ex.") A–D. Mrs. Hersko received obstetrical care at Refuah, but those services were provided to her by Defendant New Square Ob/Gyn Associates, LLP ("New Square"), not by Dr. Kirschner-Lanzkowsky. *See* Tr. at 299:5–300:14, 492:21–493:11. New Square was an independent contractor of Refuah, and Defendants Dr. Jonathan Lanzkowsky and Dr. Andrew Kramer were employees of New Square. *See* Memorandum and Order, dated Oct. 20, 2015 ("Mem. & Order"), Dkt. No. 111, at 42–43.[3]

## B.     Mrs. Hersko's Medical History Through Her 2003–2004 Pregnancy

Prior to her pregnancy in 2007 that culminated in her death, Mrs. Hersko had three pregnancies that resulted in successful deliveries of children. *See* Joint Ex. 5 at 33. Her first delivery occurred in 1997; she presented to her obstetrician for a regularly scheduled prenatal care visit during her 37th week of pregnancy, and was found to be seven centimeters dilated. *See* Joint Ex. 1 at 63; Joint Ex. 5 at 40; Tr. at 121:8–122:14. Mrs. Hersko was then sent to Mt. Sinai Hospital in Manhattan, where she gave birth. *See* Joint Ex. 1 at 89–95; Tr. at 902:10–912:12.

---

[3] Dr. Kirschner-Lanzkowsky and Dr. Lanzkowsky are married. Tr. at 93:5–6.

In 2000, Mrs. Hersko gave birth to her second child, again at Mt. Sinai Hospital, and this time after a full-term pregnancy. *See* Joint Ex. 2 at 18–24.

The pregnancy that resulted in the delivery of Mrs. Hersko's third child began in 2003 and concluded with an extramural delivery, that is, outside of a hospital, on April 23, 2004. *See* Joint Ex. 5 at 62–66; Tr. at 134:11–139:24, 154:16–25. Mrs. Hersko delivered the child on the toilet in her bathroom at home, and the delivery was accompanied by significant post-partum bleeding. *See* Joint Ex. 3; Joint Ex. 4 at 4, 31. Emergency medical personnel responded to the Hersko home and transported Mrs. Hersko to Nyack Hospital, where she was administered medications and received a transfusion of red blood cells. *See* Joint Ex. 4 at 4, 7–8, 28; Tr. at 254:3–20, 256:12–14, 268:24–269:7.

Dr. Kramer, who, along with Dr. Lanzkowsky, treated Mrs. Hersko during and immediately after this pregnancy, was notified about the delivery that resulted from this pregnancy. *See* Joint Ex. 5 at 66; Tr. at 930:12–24. Mrs. Hersko's medical record at Refuah contains a note from Dr. Kramer, which indicates that he received a call from Nyack Hospital informing him that Mrs. Hersko had delivered her baby at home, and that Dr. Kramer had not been notified by Mrs. Hersko that she was in labor. *See* Joint Ex. 5 at 66; Tr. at 930:19–931:6. Dr. Lanzkowsky then saw Mrs. Hersko for a post-partum examination on June 9, 2004. *See* Joint Ex. 5 at 67; Tr. at 164:12–18.

## C. Medical Care Provided to Mrs. Hersko by Dr. Kirschner-Lanzkowsky

As noted, Dr. Kirschner-Lanzkowsky examined Mrs. Hersko on four

4

occasions: November 16, 2004, April 4, 2006, April 24, 2006, and October 23, 2006. *See* Gov. Exs. A–D; Joint Ex. 5 at 20, 29–35. Each of these visits occurred after Mrs. Hersko's 2004 extramural delivery and before she became pregnant in 2007. Dr. Kirschner-Lanzkowsky had no memory of Mrs. Hersko from any of these visits. *See* Tr. at 496:2–5.

According to the medical records, Mrs. Hersko saw Dr. Kirschner-Lanzkowsky on November 16, 2004, because she was experiencing bleeding around her navel due to a yeast infection. *See* Gov. Ex. A; Tr. at 498:2–7. After a physical examination, Dr. Kirschner-Lanzkowsky cleaned the yeast infection and gave Mrs. Hersko a prescription to treat the infection. *See* Gov. Ex. A; Tr. at 500:14–21. The record of Mrs. Hersko's November 16 appointment also contains notations regarding her past medical history, including that she had three prior pregnancies and deliveries (what was referred to by the witnesses at trial as "gravida three para three"), that she was seven months post-partum, and that she had undergone a prior cardiac surgery in connection with Noonan's syndrome. *See* Tr. at 498:17–499:5. Dr. Kirschner-Lanzkowsky testified at trial that it was her customary practice to obtain a full history from patients during the first meeting. *See id.* at 499:9–14. Dr. Kirschner-Lanzkowsky further explained at trial that it was her practice to take an oral history from her patients to learn their relevant medical information. *See id.* at 497:1–498–1, 502:5–6. In cases where a patient is unsure or unclear of her past history, Dr. Kirschner-Lanzkowsky would obtain and review medical records for that patient. *Id.*

5

Mrs. Hersko's next visit with Dr. Kirschner-Lanzkowsky was on April 4, 2006, because Mrs. Hersko had been experiencing an irregular menstrual cycle. *See id.* at 459:5–19. Although Mrs. Hersko saw Dr. Kirschner-Lanzkowsky to address a specific problem, Dr. Kirschner-Lanzkowsky converted the visit to an annual examination and conducted a pap smear as well. *See id.* at 457:20–23. The medical history section of the April 4, 2006 record notes, among other things, that Mrs. Hersko was seeing Dr. Jose Meller, a cardiologist, that she had a problem with her heart valve, and that she had a surgical repair of a heart valve as a child. *See* Gov. Ex. B; Tr. at 504:20–24.

Additionally, notes taken by Dr. Kirschner-Lanzkowsky at the April 4 appointment indicate that Mrs. Hersko had experienced three "normal spontaneous vaginal deliveries." *See* Gov. Ex. B; Tr. at 502:19–503:14. The information about three "normal" deliveries came from Mrs. Hersko, as it was Dr. Kirschner-Lanzkowsky's practice to ask patients how many pregnancies they had had, how many children, how they delivered, and if there were complications. *See* Tr. at 503:9–13. Mrs. Hersko also reported that her last menstrual period had been on approximately February 13, 2006, and that she thought she might be pregnant. However, a pregnancy test performed at Refuah was negative. *See* Gov. Ex. B; Tr. at 501:13–16, 509:5–23.

Dr. Kirschner-Lanzkowsky would at times counsel patients regarding the process of getting pregnant, but there is no evidence that she ever provided such counseling to Mrs. Hersko. *See* Tr. at 523:16–20. Dr. Kirschner-Lanzkowsky

6

testified at trial about her customary practice to counsel patients who were not pregnant regarding pregnancy when they made an appointment for preconception counseling or if they raised the issue at an appointment. *Id.* at 522:13–525:3. She emphasized that any request to discuss potential future pregnancies would be reflected in the patient's medical record. *Id.*

Approximately three weeks later, on April 24, 2006, Mrs. Hersko saw Dr. Kirschner-Lanzkowsky to follow-up on her April 4 appointment. She had gotten her period on April 15, and the results for her pregnancy test confirmed that she was not pregnant. *See* Gov. Ex. C ; Tr. at 511:7–512:21.

On October 23, 2006, Mrs. Hersko saw Dr. Kirschner-Lanzkowsky for a fourth and last time because she was continuing to experience problems with her menstrual cycle. *See* Gov. Ex. D; Tr. at 515:19–516:16. As a result, Dr. Kirschner-Lanzkowsky referred her for a specialized ultrasound procedure to rule out the possibility of a polyp. *See* Gov. Exs. D–E; Tr. at 520:4–521:4.

Dr. Kirschner-Lanzkowsky did not review obstetrical records regarding Mrs. Hersko's 2003–04 pregnancy and delivery in connection with any of her appointments with Mrs. Hersko. *See* Tr. at 465:15–19. There is no record of Dr. Kirschner-Lanzkowsky treating Mrs. Hersko again in the nearly 12 months between October 23, 2006, and her death on October 11, 2007. *See id.* at 525:24–526:6. Dr. Kirschner-Lanzkowsky did, however, review the report of the specialized ultrasound procedure, which was performed on January 25, 2007, and left a telephone message for Mrs. Hersko on or about February 13, to let her know that

the results were normal. *See* Gov. Ex. F; Tr. at 521:12–522:03.

### D. Mrs. Hersko's 2007 Pregnancy

Mrs. Hersko saw Dr. Lanzkowsky for the first prenatal appointment of her 2007 pregnancy on March 20, 2007; at that time, she had been pregnant for approximately nine weeks, and her estimated date of delivery was October 27, 2007. *See* Joint Ex. 5 at 78–82, 86–90; Tr. at 186:17–23. Beginning with this initial prenatal visit, all of the obstetrical care and treatment provided to Mrs. Hersko during the course of her 2007 pregnancy was provided by either Dr. Lanzkowsky or Dr. Kramer. *See* Tr. at 279:2–5, 299:24–300:14; Pl. Ex. 5 at 80. Drs. Lanzkowsky and Kramer saw Mrs. Hersko for a total of nine prenatal visits during her 2007 pregnancy, on March 20, April 17, May 1, June 14, July 19, August 16, September 6, September 26, and October 9. *See* Joint Ex. 5 at 80–81; Tr. at 189:16–191:2, 196:10–12, 949:5–8. Mrs. Hersko also saw her cardiologist, Dr. Meller, on August 27, 2007, and Dr. Meller cleared Mrs. Hersko for vaginal delivery. *See* Joint Ex. 5 at 84.

As a result of Mrs. Hersko's extramural delivery in 2004, Drs. Lanzkowsky and Kramer planned to induce labor on October 22, 2007, at 39 weeks gestation. *See* Tr. at 280:12–281:8. On October 11, 2007, at 7:07 p.m., just two days after an October 9 appointment with Dr. Lanzkowsky, emergency medical technicians responded to Mrs. Hersko's residence, where she had just delivered her fourth child. Joint Ex. 6. According to the ambulance report, Mrs. Hersko was "slumped on toilet in rest room with copious blood noted on [her], [her] stockings and in toilet." *Id.*

8

The recently delivered infant was found in the toilet along with the attached placenta, and neither Mrs. Hersko nor the infant had any pulse. *See id.* After cardio-pulmonary resuscitation was initiated on both Mrs. Hersko and the infant, the infant was transported to the hospital by ambulance. *See id.* A second ambulance arrived at 7:20 p.m. and delivered Mrs. Hersko to Good Samaritan Hospital at 7:35 p.m., but Mrs. Hersko did not respond to medication or defibrillation, and she was pronounced dead at 7:58 p.m. *See* Joint Ex. 7 at 4–9. No autopsy was performed on Mrs. Hersko. *See* Tr. at 707:14–18.

## II. CONCLUSIONS OF LAW

### A. Legal Framework

As with the facts, many of the conclusions of law and applicable legal principles are not disputed by the parties. On October 20, 2015, Magistrate Judge Michael H. Dolinger, to whom this case had been assigned on consent until his retirement, granted in part and denied in part the Government's motion for summary judgment, and narrowed the case against the Government for trial. *See* Mem. & Order at 55. Plaintiff's remaining medical malpractice claim against the United States is governed by the requirements of the FTCA.

Pursuant to the FTCA, a person may bring a claim against the United States for "personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act

9

or omission occurred." 28 U.S.C. § 1346(b)(1). Because all of the care and treatment provided to Mrs. Hersko was provided in New York, the law of New York State governs the issues of liability and damages in this action. *See, e.g., Taylor v. United States*, 121 F.3d 86, 89 (2d Cir. 1997).

As a threshold matter, in an action alleging medical malpractice, "it is necessary first to establish the existence of a duty." *Burtman v. Brown*, 97 A.D.3d 156, 161 (1st Dep't 2012). If this initial requirement can be satisfied, then "[t]o establish a claim for medical malpractice under New York law, a plaintiff must prove (1) that the defendant breached the standard of care in the community, and (2) that the breach proximately caused the plaintiff's injuries." *Arkin v. Gittleson*, 32 F.3d 658, 664 (2d Cir. 1994) (citing New York cases). Plaintiff bears the burden of proving these elements by a preponderance of the evidence. *See, e.g., Kawache v. United States*, No. 08-CV-3128 (KAM) (SMG), 2011 WL 441684, at *14 (E.D.N.Y. Feb. 7, 2011), *aff'd*, 471 F. App'x 10 (2d Cir. 2012). "New York law further provides that, except as to matters within the ordinary experience and knowledge of laymen, . . . expert medical opinion evidence is required to make out both of these elements." *Milano by Milano v. Freed*, 64 F.3d 91, 95 (2d Cir. 1995) (internal quotation marks omitted) (alteration in original).

## B. Liability

### 1. Dr. Kirschner-Lanzkowsky did not owe any duty to Mrs. Hersko in connection with her 2007 pregnancy.

As to the issue of duty, because of her particular role and responsibilities at Refuah, the Court concludes that Dr. Kirschner-Lanzkowsky did not owe Mrs.

10

Hersko any duty in connection with her pregnancy. Accordingly, the United States cannot be liable for Mrs. Hersko's death. While "'physicians owe a general duty of care to their patients, that duty may be limited to those medical functions undertaken by the physician and relied upon by the patient.'" *Burtman*, 97 A.D.3d at 161–62 (quoting *Markley v. Albany Med. Ctr. Hosp.*, 163 A.D.2d 639, 640 (3d Dep't 1990)). "In other words, the question is whether the physician owes a duty under the [facts and] circumstances of a particular [case]." *Id.* at 162.

Courts have found that a doctor did not owe a duty to a patient where the patient's alleged injuries arose from a course of treatment in which the provider did not participate. *See, e.g., Huffman v. Linkow Inst. for Advanced Implantology, Reconstructive & Aesthetic Maxillo-Facial Surgery*, 35 A.D.3d 214, 216–17 (1st Dep't 2006). In addition, there are cases where judgment has been granted in favor of a defendant physician where the physician's participation in the treatment of a patient terminated prior to the alleged injury. *See, e.g., Donadio v. Crouse-Irving Mem'l Hosp., Inc.*, 75 A.D.2d 715, 715 (4th Dep't 1980). The dispositive factor in ascertaining whether a particular physician owes a duty to a particular plaintiff is not simply the physician's title or area of practice, but "the extent to which the defendant advised, and the plaintiff relied on advice about" the condition in question. *See Burtman*, 97 A.D.3d at 161. Just because physicians have a general role in the care and treatment of a patient does not automatically confer upon those physicians a duty to involve themselves in additional treatment of a specialized nature. *See Markley*, 163 A.D.2d at 641.

11

Here, there is no dispute that from March 20, 2007, the date of Mrs. Hersko's first prenatal visit related to her 2007 pregnancy, up to and including her death, all of Mrs. Hersko's obstetrical care was provided by Drs. Lanzkowsky and Kramer. Nor is there any dispute that Dr. Kirschner-Lanzkowsky, who provided only gynecological care at Refuah, last saw Mrs. Hersko on October 23, 2006. On this record, Plaintiff has not established that Dr. Kirschner-Lanzkowsky owed a duty of care to Mrs. Hersko during the course of her 2007 pregnancy—that duty belonged exclusively to Drs. Lanzkowsky and Kramer.

The only duty that Dr. Kirschner-Lanzkowsky could have had with respect to Mrs. Hersko's 2007 pregnancy would have stemmed from her treatment of Mrs. Hersko between her 2004 delivery and the onset of her 2007 pregnancy. However, there is no evidence in the record to suggest that Dr. Kirschner-Lanzkowsky undertook to offer Mrs. Hersko counseling regarding future pregnancies, or that Mrs. Hersko ever sought advice from Dr. Kirschner-Lanzkowsky on this subject. *See Burtman*, 97 A.D.3d at 161–62 (a physician's "duty may be limited to those medical functions undertaken by the physician and relied upon by the patient").

> 2. **Even if the Court assumes that Dr. Kirschner-Lanzkowsky had a duty to Mrs. Hersko in connection with her 2007 pregnancy, Dr. Kirschner-Lanzkowsky did not depart from any applicable standard of care in her treatment of Mrs. Hersko.**

To establish a claim for medical malpractice against the United States, Plaintiff must prove that Dr. Kirschner-Lanzkowsky departed from the standard of care in the community. *See Arkin*, 32 F.3d at 664 (citing New York cases). The

Government offered the expert testimony of Dr. Mary E. D'Alton as to whether Dr. Kirschner-Lanzkowsky deviated from the standard of care for a gynecologist in the circumstances of this case. Dr. D'Alton is a highly-credentialed physician, board-certified in the field of obstetrics and gynecology, with a sub-specialty in the field of maternal fetal medicine. *See* Tr. at 1151:17–18, 1161:6–11.

The Court finds the testimony of Dr. D'Alton to be credible in all respects, and relies upon this testimony in reaching its conclusion that there was no departure from the applicable standard of care. Dr. D'Alton has demonstrated significant experience and expertise in the field of maternal fetal medicine and gynecology. She is currently Chair of the Department of Obstetrics and Gynecology at Columbia University and serves as a board examiner. *See id.* at 1154:21–1156:24. In these positions she is required to be familiar with the accepted standards of care in the field of gynecology because she trains residents and fellows, and determines if candidates are ready to be board certified in obstetrics and gynecology. *See id.* at 1154:21–1156:24, 1160:18–1161:15.

According to Dr. D'Alton, Dr. Kirschner-Lanzkowsky, acting as Mrs. Hersko's gynecologist, provided care that entirely satisfied the standards of care in the specialty of gynecology. *See id.* at 1196:4–8. Mrs. Hersko presented to Dr. Kirschner-Lanzkowsky's care on each of the four occasions she saw her for specific gynecological complaints, and these complaints were competently assessed and complemented by appropriate diagnostic and treatment plans. *Id.* at 1166:19–1174:18, 1175:5–1185:14, 1186:1–1188:25, 1189:5–1194:1. Dr. D'Alton testified that

13

Dr. Kirschner-Lanzkowsky's notes and Mrs. Hersko's medical records demonstrate that Mrs. Hersko was capable of providing medical details. *Id.* at 1171:10–15. Further, there was no reason for Dr. Kirschner-Lanzkowsky to review the obstetrical records, given the medical history of Mrs. Hersko that she documented, or to request outside medical records. *Id.* at 1173:4–21, 1183:1–21, 1187:3–1188:3, 1192:7–24. Dr. Kirschner-Lanzkowsky did not need that additional information to provide the appropriate gynecological care that she rendered to Mrs. Hersko from 2004 through 2006. *Id.*

Dr. D'Alton also testified that it would have been unreasonable to expect Dr. Kirschner-Lanzkowsky to have counseled Mrs. Hersko regarding obstetrical risks based upon a history that did not exist within the medical record and the irrelevance of such counseling given the problems for which Mrs. Hersko had sought treatment. *See id.* at 1173:22–1174:9, 1183:22–1184:11, 1188:4–14, 1193:7–17. Additionally, even had Dr. Kirschner-Lanzkowsky known of a prior extramural delivery with post-partum bleeding, the expected pregnancy counseling would merely have consisted of an acknowledgment that there could be a chance of having another extramural delivery and an increased risk for a recurrence of the bleeding. *See id.* at 1195:10–21. A gynecologist would not be required to counsel the patient that she could die if she delivered extramurally again. *See id.* Given Dr. D'Alton's highly credible testimony and substantial expertise in the relevant field, the Court concludes that Dr. Kirschner-Lanzkowsky did not depart from any applicable standard of care in her treatment of Mrs. Hersko.

Moreover, the Plaintiff's expert, Dr. Gideon Panter, did not credibly articulate a basis for the Court to find otherwise. Dr. Panter, it should be noted preliminarily, has had a lengthy personal relationship with Plaintiff's counsel, Richard Frank, Esq., which calls into question his credibility as an expert witness. Dr. Panter testified that he has known Mr. Frank for more than fifty years; they have been in each others' homes socially; and Dr. Panter delivered Mr. Frank's children. *See id.* at 665:1–666:3. The Court is mindful that there would be potential financial benefits to Mr. Frank should Plaintiff prevail in this lawsuit, and Dr. Panter could arguably have been biased in wanting to see his friend succeed.

Leaving aside any potential bias on his part, Dr. Panter did not credibly present and support a finding that Dr. Kirschner-Lanzkowsky had deviated from the accepted standard of care in these circumstances. Specifically, the value of Dr. Panter's testimony was diminished by his failure to consistently differentiate between the accepted standards of practice for a gynecologist and an obstetrician. For example, he described Mrs. Hersko's first visit with Dr. Kirschner-Lanzkowsky as a "postpartum examination," although Mrs. Hersko's post-partum examination had occurred months earlier with her obstetrician, Dr. Lanzkowsky. *See id.* at 617:1–9, 623:20–624:10; Joint Ex. 5 at 67.

> **3. Finally, even if the Court were to conclude that Dr. Kirschner-Lanzkowsky had departed from the standard of care, there is absolutely no basis for the Court to conclude that such a departure was a substantial factor in causing Mrs. Hersko's death.**

To establish a claim for medical malpractice, Plaintiff must also prove that

15

Dr. Kirschner-Lanzkowsky's departure from the standard of care proximately caused Mrs. Hersko's death. *See Arkin*, 32 F.3d at 664 (citing New York cases); *Rivera v. Greenstein*, 79 A.D.3d 564, 568 (1st Dep't 2010); *see also Arkin v. Resnick*, 68 A.D.3d 692, 695 (2d Dep't 2009) (plaintiff's expert must be able to demonstrate "that the alleged departure was a substantial factor in producing the injury"). Expert testimony is necessary to establish proximate cause, unless the matter is one which is within the experience and observation of the ordinary juror. *See, e.g.*, *Milano by Milano*, 64 F.3d at 95; *Lyons v. McCauley*, 252 A.D.2d 516, 517 (2d Dep't 1998). An expert opinion offering only conclusory and speculative assertions is insufficient to support a judgment in Plaintiff's favor. *See, e.g.*, *Simmons v. Brooklyn Hosp. Ctr.*, 74 A.D.3d 1174, 1178 (2d Dep't 2010).

Here, there is nothing in the record to establish a causal link between any alleged acts or omissions of Dr. Kirschner-Lanzkowsky and the death of Mrs. Hersko. Plaintiff's expert, Dr. Panter, was unable to offer anything more than conclusory statements to link the conduct of Dr. Kirschner-Lanzkowsky to Mrs. Hersko's death, which is insufficient to satisfy Plaintiff's evidentiary burden. *See, e.g.*, *Graziano v. Cooling*, 79 A.D.3d 803, 805 (2d Dep't 2010). For example, his testimony that, had Dr. Kirschner-Lanzkowsky discussed birth control with Mrs. Hersko, "that would have definitely saved the situation," was not supported by any evidence in the record. Tr. at 618:15–23. Dr. Panter did not demonstrate any basis for stating that Mrs. Hersko would have chosen to avoid a future pregnancy had Dr. Kirschner-Lanzkowsky discussed birth control with her; he did not account for the

medical records that indicate that Mrs. Hersko had previously been prescribed birth control; and he did not describe whether it was a deviation from accepted standards of care not to discuss birth control, even when Mrs. Hersko had not raised the issue herself. *See id.* at 618:15–23, 719:1–18.

In addition, Dr. Kirschner-Lanzkowsky acknowledged that, had she known that Mrs. Hersko delivered her third child at home and suffered significant blood loss during labor, she would have counseled Mrs. Hersko that what happened during her third delivery could happen again. *See id.* at 471:15–472:8. However, even if Dr. Kirschner-Lanzkowsky had obtained the records of Mrs. Hersko's 2004 delivery, and even if a review of those records had prompted additional discussion between Dr. Kirschner-Lanzkowsky and Mrs. Hersko, it requires an extraordinary leap, unsupported by anything in the record, to conclude that any such counseling would have prevented her death. No testimony has been elicited, and no evidence introduced, as to what Mrs. Hersko would or would not have chosen to do had she been counseled that she could experience another extramural delivery and potential significant bleeding, and it is entirely speculative to suggest that she would have chosen not to become pregnant again.

In any event, Mrs. Hersko's decision to become pregnant—a decision she may have made even had she received further counseling regarding potential risks, and the only decision that theoretically could have been shaped by Dr. Kirschner-Lanzkowsky's potential counseling—was not the cause of her death. Dr. Panter himself testified that, in his view, a different plan of care for Mrs. Hersko during

the course of her 2007 pregnancy could have been formulated that would have resulted in a safe delivery. *See id.* at 724:2–9. As her obstetricians, it was the responsibility of Drs. Lanzkowsky and Kramer—and not Dr. Kirschner-Lanzkowsky—to formulate that plan. Thus, even had Dr. Kirschner-Lanzkowsky provided counseling regarding the risks of another pregnancy, and even had Mrs. Hersko ignored that counseling entirely and chosen to become pregnant, Plaintiff's expert's own view is that Mrs. Hersko's death could and would have been prevented had the obstetricians treating her in 2007 acted differently.

In short, there are simply too many intervening facts and circumstances that were established in the trial record between the last time Dr. Kirschner-Lanzkowsky saw Mrs. Hersko in 2006 and her tragic death in 2007 to warrant a finding that any deviation of care by Dr. Kirschner-Lanzkowsky could have been a significant factor in her death.

## III.    CONCLUSION

This is as tragic a case as any to come before the Court, and the Court is mindful of Plaintiff's unspeakable loss.  However, as a legal matter, for the reasons set forth herein, the Court finds that Plaintiff has failed to establish, by a preponderance of the evidence, that the United States is liable for Mrs. Hersko's death.  Accordingly, judgment is entered in favor of the United States.

**SO ORDERED.**

Dated:     May 11, 2017
           New York, New York

_____
JAMES L. COTT
United States Magistrate Judge